IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NATHAN C. NEAL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-12-1255 |
| | § | |
| CAROLYN W. COLVIN,[1] ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM AND RECOMMENDATION</u>

Pending before the court[2] are Plaintiff's Motion for Summary Judgment (Doc. 7) and Defendant's Cross Motion for Summary Judgment (Doc. 8). The court has considered the motions, the responses thereto, all relevant filings, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and that Defendant's motion be **GRANTED**.

## I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claim for disability insurance benefits under

---

[1]    Michael J. Astrue was the Commissioner of the Social Security Administration at the time that Plaintiff filed this case but no longer holds that position. Carolyn W. Colvin is Acting Commissioner of the Social Security Administration and, as such, is automatically substituted as Defendant. <u>See</u> Fed. R. Civ. P. 25(d).

[2]    This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. Doc. 5.

Title II of the Social Security Act ("the Act").

## A.  Medical History

Plaintiff was born on February 16, 1978, and was twenty-nine years old on November 17, 2007, the alleged onset date of disability.[3]  Plaintiff completed two years of college, obtained an Associate Degree, and worked as an employment representative with the human resources ("HR") department of an off-shore drilling company until November 17, 2007.[4]  Plaintiff's prior relevant work experience included employment as a dispatcher, roustabout, guest/customer service employee in a bookstore, laborer, and as an HR representative with a home health care company.[5]

### 1.  Cardiac Issues

On or around December 19, 2007, a month after Plaintiff ceased working, Plaintiff was admitted to Clear Lake Regional Medical Center complaining of general weakness and frequent urination.[6]  Nadir Ali, M.D., ("Dr. Ali") performed a transthoracic echocardiogram ("EKG") on Plaintiff.[7]  The EKG indicated the existence of a "moderate global reduction in LV [left ventricle]

---

[3]    See Doc. 4, Transcript of the Administrative Proceedings ("Tr.") 104, 113.

[4]    See Tr. 28, 54, 118, 123.

[5]    See Tr. 118, 128-35.

[6]    See Tr. 235-37.

[7]    See Tr. 210-11, 227-28, 243-44.

systolic function."[8]  On or around December 20, 2007, following a consultation with Plaintiff's primary care physician, Dale L. Messer, M.D., ("Dr. Messer"), regarding Plaintiff's heart, Dr. Ali performed a cardiac catheterization surgery and coronary angiogram on Plaintiff.[9]  The procedures indicated primary cardiomyopathy and normal coronary arteries.[10]  Dr. Ali proposed to discharge Plaintiff and evaluate whether Plaintiff would be a candidate for a defibrillator.[11]  At the time of his discharge, Plaintiff was taking six medications.[12]

Records dated January 2008 indicated that Plaintiff did not suffer from any cardiopulmonary disease.[13]  On January 23, 2008, Abdi Rasekh, M.D., ("Dr. Rasekh") surgically placed an implantable cardioverter defibrillator ("ICD") in Plaintiff's chest.[14]  Plaintiff's preoperative and postoperative diagnoses were identified as (1) bilateral cardiomyopathy, (2) congestive heart failure, functional class three, and (3) "left bundle branch block."[15]  Findings from a postoperative exam indicated that there

---

[8]    Tr. 244; see also Tr. 194, 223 (stating that EKG was normal).

[9]    See Tr. 198-99, 208, 241.

[10]   See Tr. 208, 241, 649.

[11]   See Tr. 200, 241; cf. Tr. 224, 641.

[12]   See Tr. 200.

[13]   See Tr. 213, 238-39.

[14]   See Tr. 196.

[15]   Tr. 196, 299, 564, 643.

were no apparent complications from the implant surgery and that the "[c]ardiac silhouette [was] stable."[16]

Two weeks following his surgery, on February 6, 2008, Plaintiff visited Hall-Garcia Cardiology Associates ("Hall-Garcia") on referral from Dr. Ali.[17]  Plaintiff reported fainting, chest pain, shortness of breath, coughing, wheezing, dizziness, ringing in his ears, nausea, vomiting, abdominal pain, fatigue, weight loss, insomnia, loss of appetite, joint and muscle pain, anxiety, and depression.[18]  The attending physician noted Plaintiff's complaints of near fainting and checked the site of the implant.[19] The physician found no redness, swelling, fever, or chills.[20]  After an evaluation of the device, its tracking rate was changed from 130 beats per minute to 145 beats per minute.[21]  During a follow-up appointment on February 11, 2011, Dr. Ali noted that Plaintiff's speech was slow and that Plaintiff was experiencing lethargy, tiredness, fatigue, confusion, and reduced mental acuity.[22]

Two months later, on April 10, 2008, while voluntarily admitted to The Methodist Hospital for psychological issues,

---

[16]     Tr. 212.

[17]     See Tr. 296-98.

[18]     See Tr. 297-98.

[19]     See Tr. 296.

[20]     See id.

[21]     See Tr. 301.

[22]     See Tr. 639.

Plaintiff underwent a cardiac examination.[23] The attending physician noted that she had "stressed [to Plaintiff] the importance of abstinence from substances to optimize cardiac condition."[24] An EKG report dated the following day showed that Plaintiff's left ventricle was mild-to-moderately enlarged, its functioning was moderately depressed, and its relaxation was impaired.[25] The report further indicated that Plaintiff's right ventricle functioning was at the lower limits of normal and that his right aorta was mildly enlarged.[26]

On or about May 1, 2008, an EKG showed that Plaintiff's left ventricular systolic function was mildly reduced and indicated the presence of mild hypokinesis (slow movement) of the left ventricle, trace tricuspid regurgitation, and trace pulmonic valvular regurgitation.[27] Two weeks later, on May 15, 2008, Plaintiff visited Hall-Garcia to report that his heart had been beating quickly and that he had experienced a recent episode of faintness.[28] The sensitivity of the ICD was reprogrammed and the pacing voltage

---

[23] See Tr. 342-43.

[24] Tr. 343, 345.

[25] See Tr. 408.

[26] See id. Around this time, Plaintiff visited Dr. Messer to get prescription for right knee pain. See Tr. 626.

[27] See Tr. 545, 547-48.

[28] See Tr. 569.

was decreased.[29]

Approximately one year later, on June 29, 2009, Plaintiff was admitted to Memorial Medical Center after his ICD "discharged," detecting a possible arrythmia.[30]   Plaintiff denied any shortness of breath, chest pain, nausea, vomiting, fever, or chills.[31]   A physical examination showed that Plaintiff was not in acute distress.[32]   The attending physician reprogrammed Plaintiff's ICD to minimize the chances of an inappropriate discharge.[33]   The next day, Plaintiff was discharged from Memorial Medical Center with instructions to follow up with his cardiologist and physician.[34] The record does not reflect that he did so.

### 2.  Psychological Issues

According to an undated record, Plaintiff visited Deena Gandhi, M.D., ("Dr. Gandhi") sometime prior to August 31, 2007, complaining about chronic depression.[35]   Plaintiff's reported symptoms included difficulty sleeping, continuity disturbance,

---

[29]    See id.

[30]    See Tr. 684, 699.  Plaintiff again visited Dr. Messer to get a prescription for left knee pain.  See Tr. 628.

[31]    See Tr. 684, 699.

[32]    See id.

[33]    See Tr. 687.

[34]    See Tr. 700-01.

[35]    See Tr. 542, 593.

increased appetite, and drowsiness.[36]   In the undated record, Dr. Gandhi diagnosed Plaintiff with an Axis I recurrent major depressive disorder.[37]   Notes by Dr. Gandhi dated August 31, 2007, showed that Plaintiff tolerated a Zoloft 100mg prescription and was "less angry [and] noticeably less agitated to his wife."[38] However, Plaintiff claimed that he continued to have difficulty sleeping and expressed the desire to use melatonin.[39]   Plaintiff returned to Dr. Gandhi on October 30, 2007, complaining of poor progress.[40]   Specifically, Plaintiff reported that he did not sleep well, was very emotional, and was "lingering on negative/morbid thoughts."[41]   Plaintiff also described himself as a "nervous wreck" and complained that his work was deteriorating and that his boss and coworkers noticed his emotional state.[42]   Dr. Gandhi discontinued Plaintiff's Zoloft medication and prescribed Cymbalta and Ambien.[43]

Approximately six weeks later, on December 3, 2007, Plaintiff

---

[36]   See id.  Many of the notes included in Dr. Gandhi's record are illegible.

[37]   See id.

[38]   Tr. 541, 592.

[39]   See id.

[40]   See id.

[41]   Id.

[42]   Id.

[43]   See id.

visited Dr. Messer for a medication check-up.[44]  Two days later, Dr. Messer evaluated Plaintiff for stress, anxiety, and depression.[45] Plaintiff reported that the medications helped him sleep, but did not alter his feelings of depression, stress, or anxiety.[46]  Dr. Messer ordered a magnetic resonance imaging ("MRI") of Plaintiff's head based on his complaints of frequent headaches and occasional vertigo.[47]  A list of Plaintiff's medications indicated that Plaintiff was taking five medications, including Seroquel.[48]

Ten days later, on December 13, 2007, Plaintiff returned to Dr. Messer, complaining that his medications were not working and that his symptoms were worse.[49]  In particular, Plaintiff complained about feelings of unease, racing heart, mood swings, difficulty sleeping, headaches, and delusions of "things crashing down."[50]  Dr. Messer determined that Plaintiff did not have any shortness of breath, stomach problems, edema, or hallucinations.[51]  Plaintiff's list of prescription medications remained unchanged.[52]  On December

---

[44]   See Tr. 266-67; 614-15.

[45]   See Tr. 265-66, 615-16.

[46]   See Tr. 266, 615.

[47]   See id.

[48]   See id.

[49]   See Tr. 265, 616.

[50]   See Tr. 264-65; 616-17.

[51]   See Tr. 264, 617.

[52]   See Tr. 265, 616.

18, 2007, Plaintiff complained to Dr. Messer about grogginess, which he attributed to his Seroquel prescription, and hearing conversational voices in his head.[53] Plaintiff also reported decreased headaches, anxiety, mood swings, and depression.[54] The results of an MRI of Plaintiff's head, performed on December 19, 2007, came back negative for acute ischemia, acute masses, intracranial hemorrhage, and swelling of the brain.[55]

Following his diagnosis of cardiomyopathy, Plaintiff saw Dr. Messer approximately seven times between January 2, 2008, and April 1, 2008, complaining variably about vertigo, nausea, shortness of breath, hallucinations, increased anxiety and worry, difficulty sleeping, grogginess, weakness, and loss of appetite.[56] On April 3, 2008, Plaintiff returned to Dr. Gandhi and reported that his ICD and Prozac prescription helped with some of his mental issues.[57] Dr. Gandhi recorded an Axis I diagnosis of a mood disorder and noted that Plaintiff "needs to restart intensive hospitalization."[58] Dr. Gandhi switched Plaintiff's medication from Seroquel to Abilify and referred him to The Methodist Hospital.[59]

---

[53]    See Tr. 263, 618.

[54]    See id.

[55]    See Tr. 215, 230, 292.

[56]    See Tr. 256-62, 619-25.

[57]    See Tr. 540-41, 591-92.

[58]    Id.

[59]    See id.

Six days later, on April 9, 2008, Plaintiff was voluntarily admitted to The Methodist Hospital with an Axis I mood disorder, not otherwise specified, alcohol abuse, and marijuana abuse.[60]  On a screening form, Plaintiff reported drinking approximately eight-to-twelve beers per day and smoking two-to-three marijuana cigarettes per day.[61]  At the time of his admission, Plaintiff exhibited antisocial personality traits and had a global assessment of functioning ("GAF") score ranging from ten to thirty.[62]  Plaintiff reported the same symptoms noted above, as well as both suicidal and homicidal ideation.[63]  According to the record, Plaintiff's thought processes were coherent and over-detailed, his insight and judgment were limited, and his attention and concentration were fair.[64]  He was, however, placed on "suicide and aggressive precautions" and was checked every fifteen minutes during his first two days at the hospital.[65]

While at the hospital, Plaintiff was administered medication and his treatment included group therapy, occupational therapy, and

---

[60]   See Tr. 322, 328, 338, 341, 412-50 (including care notes).

[61]   See Tr. 326, 340, 372-73.

[62]   See Tr. 326 (indicating GAF score of ten), 329 (indicating GAF score of 30).

[63]   See Tr. 323, 327-29, 331, 335-39.

[64]   See Tr. 323, 328, 341.

[65]   See Tr. 324, 341, 359, 363-64, 395, 456-72.

milieu therapy.[66]  During therapy, Plaintiff exhibited the capacity to sequence beyond five-step tasks, easily manipulate tools and materials, make independent decisions, follow multi-step instructions, achieve goals independently, work independently, ask for help at appropriate times, manage task activity, organize to a moderate level, and pay attention to detail.[67]  Further, throughout his treatment, Plaintiff grew more cooperative, his affect improved, and he denied having suicidal and homicidal ideation.[68]

Upon completing his treatment, Plaintiff was discharged from The Methodist Hospital on April 15, 2008.[69]  It was recommended that Plaintiff "[r]esume lifestyle activities engaged in prior to this onset/exacerbation of illness."[70]  A mental status exam performed prior to Plaintiff's discharge indicated that Plaintiff was casually dressed and well groomed with good eye contact.[71]  His speech had a normal rate, volume, and rhythm; his mood was described as "pretty good" and his affect "[h]ad good variation and was stable."[72]  Plaintiff denied any hallucinations, suicidal ideation, or homicidal ideation and his thought processes were

---

[66]   See Tr. 324, 341, 350, 353, 373, 488-504.

[67]   See Tr. 380-89.

[68]   See Tr. 324, 348, 351, 354-56, 398, 400-07.

[69]   See Tr. 322, 370.

[70]   Tr. 392.

[71]   See Tr. 324.

[72]   Id.

"logical, clear and goal-directed."[73] His insight and judgment were "much improved" and his attention and concentration were good.[74] Plaintiff's discharge diagnoses included an Axis I "[m]ajor depressive disorder, moderate," alcohol and marijuana abuse, and a GAF score of sixty.[75] Plaintiff was instructed to follow up with Dr. Gandhi for medication management and psychotherapy.[76]

On Plaintiff's final visit to Dr. Gandhi, on April 23, 2008, Dr. Gandhi diagnosed Plaintiff with an Axis I mood disorder.[77] Two weeks later, on May 7, 2008, Vera A. Gonzales, Ph.D., ("Dr. Gonzales") conducted a mental status interview with Plaintiff.[78] Regarding activities of daily living, Plaintiff reported that he could take care of his personal hygiene and make sandwiches.[79] Based on her interview of Plaintiff, Dr. Gonzales determined that Plaintiff's concentration was fair and his judgment, insight, and short-term memory were poor.[80] Dr. Gonzales diagnosed Plaintiff with an Axis I bipolar disorder and major depressive disorder, gave

---

[73]   Id.

[74]   Id.

[75]   Tr. 322.

[76]   See Tr. 370, 531-38.

[77]   See id.  Plaintiff was scheduled for an appointment with Dr. Gandhi on May 19, 2008, but failed to show.  See Tr. 590.

[78]   See Tr. 550-52.

[79]   See Tr. 551.

[80]   See Tr. 552.

him a provisional GAF score of forty-two or forty-three, and indicated that Plaintiff's prognosis was guarded.[81] She also noted that Plaintiff was unable to manage his finances or medical regimen.[82] The next day, Plaintiff saw Dr. Messer and complained about stress, reduced energy and memory, and difficulty concentrating.[83]

In early June 2008, Dr. Gandhi completed a mental status report concerning Plaintiff.[84] Dr. Gandhi determined that Plaintiff's general appearance, grooming, motor behavior, voice, speech, memory, attention, concentration, insight, judgment, prognosis, ability to relate to others and sustain work, ability to respond to change/stress in the workplace, and orientation to time, place, and person were fair.[85] She also noted that Plaintiff's mood and affect were depressed/flat and that his thought content included suicidal and homicidal ideation.[86] Dr. Gandhi determined that Plaintiff had an Axis I diagnosis of bipolar disorder.[87]

Nearly one year later, on May 8, 2009, Plaintiff was involuntarily admitted by a peace officer to the East Texas Medical

---

[81]    See id.

[82]    See id.

[83]    See Tr. 627.

[84]    See Tr. 588-90.

[85]    See id.

[86]    See Tr. 588-89.

[87]    See Tr. 589.

Center ("ETMC") for depression and suicidal ideation.[88]  Plaintiff was subsequently transferred to a different ETMC facility, where lab results revealed the presence of marijuana in Plaintiff's system.[89]  Plaintiff exhibited fair insight into problems, poor insight into resolution of problems, and impaired judgment; he also reported having hallucinations and suicidal ideation, as well as vision problems.[90]  Plaintiff was diagnosed with either a bipolar disorder and mixed episode or a major depressive disorder with psychosis and was assigned a GAF score of fifteen at admission and a GAF score of forty-five at discharge.[91]

### 3. Seizures

The earliest record before the court regarding seizures is an emergency room record dated April 1, 2009.[92]  The attending nurse noted that Plaintiff exhibited distress and complained of seizures, but did not note any abnormalities following a physical examination of Plaintiff.[93]  A computed tomography (CT) scan of Plaintiff's head indicated no evidence of hemorrhaging, masses, or other abnormalities; a chest x-ray revealed a normal chest with an ICD.[94]

---

[88]   See Tr. 705-12.

[89]   See Tr. 676.

[90]   See Tr. 676, 681.

[91]   See Tr. 679-80.

[92]   See Tr. 655, 659-64.

[93]   See Tr. 662-63.

[94]   See Tr. 665-66.

Plaintiff was treated with Vicodin and Celebrex and discharged from the hospital that same day.[95]  During an evaluation of his seizure activity on April 16, 2009, Plaintiff reported that he had experienced two seizures on February 1, 2009.[96]  A physical examination indicated no abnormalities, but the attending physician recommended that Plaintiff take medication for an iron deficiency and refrain from driving for six months.[97]  A June 2009 medical record indicated that Plaintiff's seizure disorder was stable.[98]

## B.  Application to Social Security Administration

Plaintiff protectively filed for disability insurance benefits on March 10, 2008, claiming an inability to work due to dilated cardiomyopathy, congestive heart failure, and a bipolar disorder.[99]

In an initial disability report completed that same day, Plaintiff reported that, because of his medical conditions, he could not lift or carry objects, concentrate or maintain a conversation, or overexert himself.[100]  Plaintiff also stated that he performed tasks very slowly.[101]  At the time of the disability

---

[95]      See Tr. 657-58

[96]      See Tr. 673.

[97]      See Tr. 673-74.

[98]      See Tr. 685.

[99]      See Tr. 104-10.  The protective filing date was February 19, 2008.  See Tr. 113, 117.

[100]      Tr. 115, 117.

[101]      Id.

report, Plaintiff reported that he was taking six medications for his heart, four medications for his bipolar/mental disorder, one medication for anxiety, and one medication for indigestion.[102]  He reported no side effects from any of his medications.[103]  According to Plaintiff, his daily activities included walking up and down the driveway once or twice, emailing, talking on the telephone, writing letters, playing video games, reading, and cleaning rooms in his home one at a time.[104]

On May 8, 2008, Teresa Fox, M.D., ("Dr. Fox") completed a Physical RFC Assessment.[105]  The assessment reflected that Plaintiff was capable of occasionally lifting twenty pounds, frequently lifting ten pounds, standing or walking for about four hours in an eight-hour workday, sitting for about six hours in an eight-hour workday, and pushing or pulling without limitations.[106]  Dr. Fox also opined that Plaintiff could climb a ramp or stairs frequently but could never climb a ladder, rope, or scaffolds, could balance frequently, could stoop frequently, could kneel frequently, could crouch frequently, and could crawl frequently.[107]  Dr. Fox cited bilateral cardiomyopathy and congestive heart failure as the basis

---

[102]   See Tr. 122.

[103]   Id.

[104]   Tr. 126.

[105]   See Tr. 555-62.

[106]   See Tr. 556.

[107]   See Tr. 557.

16

for Plaintiff's physical limitations.[108]   No other physical limitations were found, and Dr. Fox stated that Plaintiff's alleged limitations were not wholly supported by the medical record.[109]

Approximately one month later, on June 4, 2008, Robert Gilliland, M.D., ("Dr. Gilliland") completed a Psychiatric Review Technique based on medical findings of a bipolar disorder.[110]  Dr. Gilliland found that Plaintiff had a medically determinable impairment of bipolar/major depressive disorder that did not "precisely satisfy the diagnostic criteria" for affective disorders as described in the listings of the regulations[111] (the "Listings").[112]  According to Dr. Gilliland, Plaintiff experienced: moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.[113]

With regard to Plaintiff's mental RFC, Dr. Gilliland determined that Plaintiff was not significantly limited in the areas of remembering locations and work-like procedures, understanding and remembering very short and simple instructions,

---

[108]    See Tr. 555.

[109]    See Tr. 558-62.

[110]    See Tr. 594-607.

[111]    20 C.F.R. Pt. 404, Subpt. P, App. 1.

[112]    Tr. 597.

[113]    See Tr. 604.

carrying out very short and simple instructions, performing activities within a schedule, maintaining regular attendance and being punctual, making simple work-related decisions, asking simple questions or requesting assistance, maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness, being aware of normal hazards and taking appropriate precautions, traveling in unfamiliar places or using public transportation, and setting realistic goals or making plans independently of others.[114]

Dr. Gilliland found Plaintiff moderately limited in the areas of maintaining attention and concentration for extended periods, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being distracted, completing a normal workday and workweek without interruptions from his psychological symptoms, performing at a consistent pace without unreasonable rest periods, interacting appropriately with the general public, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers without distracting them or exhibiting behavioral extremes, and responding appropriately to changes in the work setting.[115] Plaintiff was found to be markedly limited in the areas of understanding and remembering detailed instructions and

---

[114]    See Tr. 608-09.

[115]    See id.

carrying out detailed instructions.[116]

On June 6, 2008, Plaintiff's claim for benefits was denied at the initial stage of administrative review.[117]  Plaintiff filed a request for reconsideration on June 27, 2008, and submitted a second disability report on July 11, 2008.[118]  In this subsequent disability report, Plaintiff added three anxiety and depression medications to his list of medications.[119]  The report indicated that Plaintiff experienced a number of side effects from many of his medications, namely, drowsiness, dizziness, impaired mental faculties, and stomach discomfort.[120]

According to a function report completed by Plaintiff's spouse on July 30, 2008, Plaintiff would "sleep, cry, sit, [and] stare at the walls or ceiling" from the time he awoke until the time he retired at night.[121]  Additionally, Plaintiff required assistance while bathing, could not keep his arms raised to wash his hair and shave, and would urinate on himself.[122]  The report also stated that Plaintiff could not prepare his own meals, perform any household

---

[116]  <u>See</u> Tr. 608.

[117]  <u>See</u> Tr. 58, 60, 126.

[118]  <u>See</u> Tr. 65, 138-48.

[119]  <u>See</u> Tr. 144-45.

[120]  <u>Id.</u>

[121]  Tr. 149.

[122]  Tr. 150.

chores, manage money, or handle finances.[123]   Plaintiff's conditions also limited his ability to engage in work-related activities.[124] Specifically, the report indicated that Plaintiff could walk a distance of six feet before needing a thirty-minute break, could pay attention for five seconds at a time, could not follow written or spoken instructions, and could not handle stress.[125]   Plaintiff also reportedly used a wheelchair and cane, which were prescribed in December 2007.[126]   On August 11, 2008, approximately two weeks after Plaintiff's spouse completed the function report, Plaintiff's application for benefits was denied at the reconsideration level of administrative review.[127]

Sometime after September 16, 2008, Plaintiff submitted an updated disability report indicating that his heart was becoming weaker and that he needed his medication increased but "was unable to tolerate due to anxiety."[128]   According to the report, Plaintiff was placed on a waiting list for a heart transplant and had his medication increased in mid-September 2008.[129]

In November 2008, Plaintiff requested a hearing before an

---

[123]   Tr. 151-52.

[124]   Tr. 154.

[125]   Tr. 154-55.

[126]   Tr. 155.

[127]   See Tr. 59, 69, 157; see also Tr. 637-38.

[128]   Tr. 162.

[129]   See Tr. 162.

administrative law judge ("ALJ") of the Social Security Administration.[130]   The ALJ granted Plaintiff's request and conducted a hearing on July 2, 2009.[131]

## C.  **Hearing**

Plaintiff and Byron Pettingill ("Pettingill"), a vocational expert, testified at the July 2009 hearing.[132]  Plaintiff had been hospitalized a few days prior to the hearing because his ICD had discharged.[133]  He was released from the hospital on the day before the hearing.[134]

Plaintiff testified that, as of the date of the hearing, he lived with his mother and brother, and was going through divorce proceedings.[135]  Plaintiff and his estranged wife had two children for whom Plaintiff paid child support.[136]  Plaintiff testified that he had an Associate Degree and was last employed in December 2007 with an off-shore drilling company's HR department.[137]  He stated that he loved working, but left work due to his heart condition and an inability to perform his tasks and in order to seek medical

---

[130]   See Tr. 73-74.

[131]   See Tr. 22-57, 81-102.

[132]   See Tr. 22-57.

[133]   See Tr. 45, 48-49.

[134]   See Tr. 45, 48.

[135]   See Tr. 26-27.

[136]   See Tr. 27.

[137]   See Tr. 27-28

care.[138]   According to Plaintiff's testimony, Plaintiff had no history of heart problems prior to December 2007.[139]   Plaintiff testified that, in 2008, he began receiving $2,500 per month in long-term disability payments through his employer and was receiving that monthly amount at the time of the hearing.[140] Plaintiff added that he paid for his medications out of pocket and that his only health insurance was through his estranged wife.[141]

With respect to treatment for his physical conditions, Plaintiff testified that he took medication for his heart condition and regularly visited a cardiologist for checkups and refills of his medication.[142]   He also stated that he was hospitalized for his heart condition on several occasions since his diagnosis in late 2007.[143]   In January 2008, Plaintiff received a pacemaker.[144] According to Plaintiff, his heart condition was at stage three of the New York Heart Association's functional classification.[145] Plaintiff's attorney explained that "[c]lass three patients are patients with cardiac disease with large limitations of physical

---

[138]   Tr. 28.

[139]   See id.

[140]   See Tr. 29.

[141]   See Tr. 29-30.

[142]   See Tr. 30.

[143]   See id.

[144]   See Tr. 37.

[145]   See Tr. 52.

22

activity, they're comfortable at rest, less than an ordinary activity causes fatigue, palpitations, dysinpia (PHONETIC) or angina pain."[146]

Responding to the ALJ's questions about Plaintiff's history of seizures, Plaintiff testified that he first had a seizure in 1997, followed by one in 2001 or 2002.[147]  According to his testimony, Plaintiff was not aware of any other seizures until April 2009, when he suffered "two major tonic[-]clonic seizures in one day."[148] Plaintiff stated that he was hospitalized immediately following the two seizures in April 2009 and was prescribed Dilantin, which he took for a month before finding out that he was allergic to it.[149] He then began taking valproic acid (Depakote) to treat his seizures.[150]  Prior to April 2009, Plaintiff stated that he had not taken any medication for seizures.[151]  Plaintiff also reported that his most recent seizure occurred around May 23, 2009.[152] Because of his seizure activity, Plaintiff stated, he did not drive.[153]  He was

---

[146]    Tr. 53.

[147]    See Tr. 32-33.

[148]    Tr. 32.

[149]    See Tr. 31-32.

[150]    See Tr. 31.

[151]    See Tr. 33.

[152]    See Tr. 30-31.

[153]    See Tr. 41.

driven to doctor appointments and hospitalizations by a friend.[154]

Regarding his mental impairments, Plaintiff testified that he was diagnosed and treated for depression with anxiety and, later, for a bipolar disorder.[155]   According to Plaintiff, he had been taking medication for his mental issues since 2004 and had last seen a psychologist or psychiatrist two months earlier, in May 2009.[156]   Plaintiff reported that his general practitioner prescribed his medications and that he was compliant with the treatment regimen.[157]   In response to the ALJ's inquiry whether the medications help him, Plaintiff responded, "Yes, sir, absolutely."[158]   Nonetheless, Plaintiff testified that he began using marijuana in May 2009 because he was depressed.[159]   Plaintiff claimed that he sought help from a behavioral health clinic and completed a rehabilitation program offered by the clinic.[160]   He further stated that he joined Narcotics Anonymous ("NA") groups and continued to attend NA meetings.[161]

When questioned about the physical limitations resulting from

---

[154]   See Tr. 44.

[155]   See Tr. 34.

[156]   See Tr. 34-35.

[157]   See Tr. 35.

[158]   Id.

[159]   See id.

[160]   See Tr. 36.

[161]   See id.

his conditions, Plaintiff testified that he could not lift over ten pounds.[162]  Due to the insertion of an ICD, Plaintiff was not to overly exert himself by walking.[163]  He testified that he could sit from thirty minutes to forty-five minutes at a time and stand for five-to-ten minutes before becoming uncomfortable and needing to sit.[164]  Plaintiff's daily activities included taking care of personal hygiene, cleaning up after himself, washing small loads of dishes and clothes, taking medications, reading, watching television, and using the computer to communicate, research his interests, and play games.[165]  Plaintiff informed the ALJ that he would move to "stations" in his home throughout the day and would sit outside on occasion to avoid being in the same place all day.[166]

In response to questions by his attorney, Plaintiff testified that he could bend and pick an object off the floor, but would not do so more than once or twice in a row because he had occasionally blacked out upon standing up.[167]  Plaintiff also stated that he did not use stairs because he did not want to exert himself.[168]  He testified that he could raise his arms to grab something off a

---

[162]   See Tr. 37.

[163]   See id.

[164]   See id.

[165]   See Tr. 37-42.

[166]   Tr. 37, 40.

[167]   See Tr. 49.

[168]   See id.

shelf, but did not push or pull much, especially on his left side, because of his ICD and lifting restrictions.[169]   Continuing, Plaintiff claimed that he suffered from dizziness and had "just below average" balance.[170]  He rated his overall stamina and energy levels as "poor at best."[171]

Plaintiff additionally testified that, due to the side effects of his medications, he was not as mentally sharp as he was prior to the onset of his conditions.[172]  He identified this decrease in his mental acuity as one of the major obstacles preventing him from working, along with his limited ability to exert himself.[173]   He claimed that he kept a journal to help him remember and for therapy.[174]

Having reviewed the record and after hearing Plaintiff's testimony, Pettingill testified that Plaintiff's most recent work history and experience in HR constituted skilled work performed at a light level of exertion.[175]  Plaintiff's previous work was designated as follows: (1) work as a dispatcher constituted skilled work performed at the sedentary level of exertion; (2) work as a

---

[169]   See Tr. 50-51.

[170]   Tr. 51.

[171]   Id.

[172]   See Tr. 45.

[173]   See Tr. 49-50.

[174]   See Tr. 50.

[175]   See Tr. 54.

roustabout was semi-skilled work performed at the very heavy level of exertion; (3) work as a customer service clerk in a bookstore was semi-skilled position and customarily performed at the light level of exertion, but was performed by Plaintiff at the medium exertional level; (4) work as a construction worker was unskilled and performed at the very heavy level of exertion.[176]

The ALJ posed a hypothetical question to Pettingill about whether an individual of Plaintiff's age and education level, who was able to walk about two hours of an eight-hour workday, lift twenty pounds occasionally and ten pounds frequently with a sit/stand option, push and pull at will, demonstrate the full ability for gross and fine manipulation, occasionally climb stairs, bend, stoop, crouch, crawl, balance, twist, and squat, but was restricted from ladders, ropes, scaffolds, and running would be able to perform Plaintiff's past work.[177]   The hypothetical individual also was able to get along with others, understand simple instructions, exercise simple concentration, perform simple tasks, and respond to workplace changes and supervision in a setting with limited public contact.[178]   Pettingill responded that the hypothetical individual would not be able to perform

---

[176]   See id.

[177]   See Tr. 55.

[178]   See id.

27

Plaintiff's past work.[179]   He also testified that none of Plaintiff's skills were transferable to an individual limited to the performance of simple tasks.[180]   Pettingill identified the following unskilled, sedentary jobs that could be performed by the aforementioned hypothetical: order clerk, charge account clerk or credit information clerk, and telephone information clerk.[181]

Plaintiff's attorney posed a question to Pettingill as to whether the hypothetical individual would be able to perform the identified jobs of order clerk, charge account or credit information clerk, or telephone information clerk if he had to take frequent, unscheduled breaks, to which Pettingill responded in the negative.[182]   Upon further questioning, Pettingill testified that the aforementioned jobs would require frequent handling of a keyboard or telephone.[183]

### D.   Commissioner's Decision

On July 24, 2009, the ALJ issued an unfavorable decision.[184] The ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2012.[185]   The ALJ then followed the

---

[179]   See id.

[180]   See Tr. 55-56.

[181]   See Tr. 56.

[182]   See Tr. 56-57.

[183]   See Tr. 57.

[184]   See Tr. 7-20.

[185]   See Tr. 12.

five-step process outlined in the regulations, finding at the first step that Plaintiff had not engaged in substantial gainful activity since November 17, 2007.[186]  At step two of the disability process, the ALJ found that Plaintiff had multiple impairments (cardiomyopathy, a history of congestive heart failure, seizure disorder, bipolar disorder, depression, and a history of substance abuse) that were severe.[187]

At step three of the analysis, the ALJ determined that Plaintiff's impairments, singly, or in combination, were not of a severity sufficient to meet or equal one of the Listings at any point of the alleged disability period.[188]  Regarding Plaintiff's physical impairments, the ALJ specifically considered Listing 4.02 (chronic heart failure), Listing 4.04 (ischemic heart disease), Listing 4.05 (recurrent arrhythmias), Listing 4.06 (symptomatic congenital heart disease), Listing 11.02 (epilepsy-convulsive epilepsy), and Listing 11.03 (epilepsy-nonconvulsive epilepsy).[189] With respect to Plaintiff's mental impairments, the ALJ provided a detailed analysis of Listing 12.04 (affective disorders) and Listing 12.09 (anxiety-related disorders).[190]

---

[186]    See id.

[187]    See id.

[188]    See Tr. 12-13.

[189]    See Tr. 12.

[190]    See Tr. 13.

Having considered the entire record, the ALJ then conducted an assessment of Plaintiff's RFC based on the objective medical record and Plaintiff's testimony and conduct at the hearing.[191]   He determined that Plaintiff retained the RFC to perform sedentary work with the following limitations: lifting and/or carrying ten pounds occasionally and five pounds frequently with a sit/stand option; walking for two hours or less in an eight-hour workday; occasionally climbing stairs, bending, stooping, crouching, crawling, balancing, twisting, and squatting; never running or climbing ladders, ropes, or scaffolds.[192]   The ALJ found that Plaintiff's ability to push and pull, as well as his ability for fine and gross dexterity, was unlimited.[193]   Further, the ALJ concluded that, mentally, Plaintiff retained "the ability to get along with others; understand simple instructions; concentrate and perform simple tasks; respond and adapt to workplace changes and supervision in a limited public/employee setting."[194]  Although the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, he did not find Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms" to be credible to the

---

[191]   See Tr. 14-18.

[192]   See Tr. 14.

[193]   See id.

[194]   Id.

extent they were inconsistent with the ALJ's RFC determination.[195]

Turning to steps four and five, the ALJ considered Pettingill's opinion that an individual of Plaintiff's age, education, work experience, and mental and physical RFC would not be able to perform Plaintiff's past relevant work, but would be able to perform the jobs of order clerk, charge account clerk, and telephone information clerk.[196] Relying on Pettingill's opinion and the framework of Rule 201.28 of the SSA's Medical-Vocational Guidelines, the ALJ determined that Plaintiff was capable of performing work existing in significant numbers in the regional and national economy.[197] He therefore concluded that Plaintiff was not disabled under the Act at any point of his alleged disability.[198]

Plaintiff appealed the ALJ's decision to the Appeals Council; attached to his appeal brief, Plaintiff submitted an RFC questionnaire completed by Roberta Bogaev, M.D., ("Dr. Bogaev") based on her treatment of Plaintiff in July 2008.[199] Dr. Bogaev noted symptoms of chest pain, nausea, dizziness, and anxiety.[200] Dr. Bogaev concluded that, given Plaintiff's depression and anxiety, Plaintiff could handle moderate work stress and that

---

[195]   Tr. 15.

[196]   See Tr. 18-19.

[197]   See Tr. 19.

[198]   See Tr. 19-20.

[199]   See Tr. 174-79.

[200]   See Tr. 174.

Plaintiff's prognosis was good.[201]  She indicated that Plaintiff's symptoms often interfered with his attention and concentration.[202] Regarding Plaintiff's work-related limitations, Dr. Bogaev determined that Plaintiff could: sit and stand for more than two hours in an eight-hour workday; frequently lift ten pounds, occasionally lift ten or twenty pounds, and rarely lift fifty pounds; and frequently twist, stoop, crouch, climb ladders, and climb stairs.[203]  She estimated that Plaintiff would require an unscheduled break every two-to-four hours and would be absent from work about four days per month as a result of his impairments.[204]

The Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[205]  Plaintiff then timely sought judicial review of the decision by this court.

## II.   Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the

---

[201]    See Tr. 174-75.

[202]    See Tr. 176.

[203]    See Tr. 176-78.

[204]    See Tr. 177, 179.

[205]    See Tr. 1-6, 21, 169-79.

decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.  Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving he is disabled within the meaning of the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991).  Under the applicable legal standard, a claimant is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings.  42 U.S.C. § 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a

> result of his impairment, then factors such as his age,
> education, past work experience, and [RFC] must be
> considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20

C.F.R. § 404.1520.  By judicial practice, the claimant bears the

burden of proof on the first four of the above steps, while the

Commissioner bears it on the fifth.  Crowley v. Apfel, 197 F.3d

194, 198 (5th Cir. 1999).  If the Commissioner satisfies her step-

five burden of proof, the burden shifts back to the claimant to

prove he cannot perform the work suggested.  Muse v. Sullivan, 925

F.2d 785, 789 (5th Cir. 1991).  The analysis stops at any point in

the process upon a finding that the claimant is disabled or not

disabled.  Greenspan, 38 F.3d at 236.

**B.   Substantial Evidence**

The widely accepted definition of "substantial evidence" is

"that quantum of relevant evidence that a reasonable mind might

accept as adequate to support a conclusion." Carey v. Apfel, 230

F.3d 131, 135 (5th Cir. 2000).  It is "something more than a

scintilla but less than a preponderance." Id.  The Commissioner

has the responsibility of deciding any conflict in the evidence.

Id.  If the findings of fact contained in the Commissioner's

decision are supported by substantial record evidence, they are

conclusive, and this court must affirm.  42 U.S.C. § 405(g);

Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings

exist to support the Commissioner's decision should the court overturn it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment.  Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  Id.

### III.  Analysis

Plaintiff requests judicial review of the Commissioner's decision to deny disability benefits.  Plaintiff contends that the Commissioner's decision is not supported by substantial evidence and that the ALJ did not follow proper legal procedures.[206]  In particular, Plaintiff argues that: (1) the ALJ failed to discuss and evaluate the side effects of Plaintiff's medications; (2) the RFC of the hypothetical individual presented to the vocational expert failed to account for all of Plaintiff's impairments and limitations; and (3) the Appeals Council failed to properly

---

[206]   Plaintiff contends that the ALJ grants only seven percent of the disability claims that come before him, whereas the average in the nationwide is approximately fifty percent.  See Doc. 7, Pl.'s Mot. for Summ. J. p. 4.  He further claims that an ALJ with these statistics "is unable to impartially adjudicate appropriately" and necessarily commits fundamental errors in denying benefits.  Id.  Here, the relevant issue is whether the ALJ applied proper legal standards and whether substantial evidence supports the ALJ's decision in this case.  Waters, 276 F.3d at 718.  Statistics do not alter that determination.  See, e.g., Smith v. Astrue, 2008 WL 4200694, at *5-6 (S.D. Tex. Sept. 9, 2008) (rejecting argument that an ALJ was biased against all Social Security disability claimants where the ALJ had a 7.19% approval rate for disability benefits).

consider new evidence from Plaintiff's treating physician. Defendant argues that the decision is legally sound and is supported by substantial evidence. The court considers the merits of the arguments in turn.

## A.   **Medication Side Effects**

Plaintiff argues that the ALJ erred in failing to discuss the side effects from Plaintiff's medications and their effect on Plaintiff's ability to work.

The regulations state that any side effects of medication should be considered when reaching a decision on a claimant's ability to work. 20 C.F.R. § 404.1529(c)(3)(iv); see also Loza v. Apfel, 291 F.3d 378, 396-97 (5th Cir. 2000).  In support of his argument that the ALJ failed to comply with the regulations, Plaintiff points to a list of medications submitted to the Social Security Administration indicating that Plaintiff experienced side effects of drowsiness, dizziness, impaired mental faculties, diminished concentration, and stomach discomfort.[207]  Plaintiff also cites to his hearing testimony that his medications decreased his mental acuity.  A review of the medical record reveals that Plaintiff intermittently reported these symptoms to various physicians during the relevant period of his alleged disability. The medical record as a whole, however, is unclear as to whether these symptoms were products of and originated from Plaintiff's

---

[207]    See Tr. 164.

physical and mental impairments or were side effects of his medications.

Although the ALJ did not specifically mention side effects of medication in his decision to deny benefits, the court must assume that the ALJ considered the aforementioned symptoms of Plaintiff's medications in light of the limitations identified in the ALJ's RFC calculation. For instance, to the extent Plaintiff experienced impaired mental faculties and diminished concentration, regardless of whether they were symptoms of an impairment or side effects of medication, the ALJ incorporated the effects of these symptoms in his RFC determination by limiting Plaintiff's work-related activities. Specifically, the limitations resulting from these symptoms are reflected in the ALJ's determination that Plaintiff could only understand simple instructions and concentrate on and perform simple tasks. Similarly, the ALJ took into account Plaintiff's dizziness by restricting Plaintiff from climbing ladders, ropes, and scaffolds, and incorporated Plaintiff's drowsiness by imposing a sit/stand requirement in Plaintiff's RFC.

Because the ALJ incorporated the alleged medication side effects discussed above when he calculated Plaintiff's RFC, the court also assumes that the ALJ considered and rejected side effects that were not incorporated into Plaintiff's RFC. Specifically in regard to the remaining symptom cited by Plaintiff as a medication side effect, stomach pain, Plaintiff does not cite

to anywhere in the record where he complained of stomach pain that
would have resulted in work-related limitations.  The court, after
reviewing the record, notes that, on December 13, 2007, Dr. Messer
determined that Plaintiff was not suffering from stomach pain.
Additionally, Plaintiff reported that he did not experience side
effects from any of his medications when he initially applied for
disability benefits on March 10, 2008.

Moreover, a screening form completed when Plaintiff was
voluntarily admitted to The Methodist Hospital on April 9, 2008,
indicated that Plaintiff did not suffer from nausea or abdominal
distress.   On June 29, 2009, Plaintiff denied any nausea or
vomiting, as well as other symptoms, when he was admitted to
Memorial Medical Center after his ICD discharged.  Finally, at the
hearing three days later, on July 2, 2009, Plaintiff failed to
mention experiencing any side effects of stomach pain that would
limit his ability to work.   The ALJ's failure to incorporate
Plaintiff's stomach pain in his RFC calculation is thus supported
by substantial record evidence.

**B.   RFC Determination**

By challenging the description of the hypothetical individual
presented to the vocational expert at the July 2009 hearing,
Plaintiff contends that the ALJ's RFC determination failed to take
into account all of Plaintiff's work-related limitations.   In
particular, Plaintiff argues that the ALJ did not account for the

effect of Plaintiff's medications on his ability to perform work-related activities or for Plaintiff's non-exertional limitations related to depression.  As discussed above, the court determined that the ALJ properly accounted for Plaintiff's alleged medication side effects and that the ALJ's decision is supported by substantial record evidence.  The court need not address this argument again and thus turns to consider Plaintiff's argument regarding non-exertional limitations related to depression.  In support of this argument, Plaintiff cites to his voluntary commitment at The Methodist Hospital from April 9, 2008, to April 15, 2008, his mental status interview with Dr. Gonzales on May 7, 2008, and his involuntary commitment at ETMC on May 8, 2009.[208]

With respect to Plaintiff's commitment at The Methodist Hospital for depression, the record indicates that Plaintiff exhibited antisocial personality traits and had a GAF score ranging from ten to thirty at the time he was admitted.  His thought processes were coherent and over-detailed, his insight and judgment were limited, and his attention and concentration were fair.  At therapy, Plaintiff was able to sequence beyond five-step tasks, easily manipulate tools and materials, make independent decisions, follow multi-step instructions, achieve goals independently, work

---

[208]   Plaintiff contends that he was involuntarily committed at ETMC for seven-to-ten days.  See Doc. 7, Pl.'s Mot. for Summ. J., p. 16.  The medical record indicates only that Plaintiff's stay was projected at seven-to-ten days; however, Plaintiff's ETMC records extend only from May 8, 2009, to May 9, 2009. See Tr. 675-79.

independently, ask for help at appropriate times, manage task activity, organize to a moderate level, and pay attention to detail. Plaintiff grew more cooperative, and, at his discharge, it was recommended that Plaintiff "[r]esume lifestyle activities engaged in prior to this onset/exacerbation of illness."[209]   A mental status exam performed around the time of Plaintiff's discharge indicated that Plaintiff's mood was "pretty good," his affect "[h]ad good variation and was stable," his thought processes were "logical, clear and goal-directed," his insight and judgment were "much improved," and his attention and concentration were good.[210]

Regarding Plaintiff's interview with Dr. Gonzales in May 2008, Plaintiff reported that he could take care of his personal hygiene and make sandwiches.[211]   Based on her interview of Plaintiff, Dr. Gonzales determined that Plaintiff's concentration was fair and his judgment, insight, and short-term memory were poor and that he was unable to manage his own finances or medical regimen.   During his involuntary commitment at ETMC one year later, in May 2009, Plaintiff exhibited fair insight into problems, poor insight into resolution of problems, and impaired judgment.

Contrary to Plaintiff's position, the ALJ considered and

---

[209]   Tr. 392.

[210]   Tr. 324.

[211]   See Tr. 551.

discussed each of these occurrences in determining Plaintiff's RFC.[212] Specifically, the ALJ incorporated in his RFC determination the mental health findings contained in these records by finding that Plaintiff could understand simple instructions, concentrate on and perform simple tasks, and function in a limited public/employee workplace.   The ALJ's RFC determination was thus supported by substantial evidence of record.   The limitations articulated in the ALJ's RFC determination were ascribed to the hypothetical individual presented to Pettingill, the vocational expert, at the hearing.

The court further notes that a mental status report completed by Dr. Gandhi in June 2008 indicated that Plaintiff's general appearance, grooming, motor behavior, voice, speech, memory, attention, concentration, insight, judgment, prognosis, ability to relate to others and sustain work, ability to respond to change/stress in the workplace, and orientation to time, place, and person were fair.   Moreover, Plaintiff reported on several occasions, including the July 2009 hearing, that despite his mental impairments, he could take care of his personal hygiene, wash dishes, do laundry, clean rooms one at a time, make sandwiches, read non-fiction books, play chess, play video games, surf the internet, compose emails and letters, talk on the phone, and watch television.   This constitutes further substantial record evidence

---

[212]     See Tr. 17.

supporting the ALJ's RFC determination and, thereby, the hypothetical individual described to Pettingill at the hearing.

The court accordingly finds no legal error in the ALJ's formulation of the hypothetical individual reflecting Plaintiff's age, education, work history, impairments, physical and mental RFC, and limitations, from which Pettingill determined that said hypothetical individual could perform the jobs of order clerk, charge account clerk or credit information clerk, and telephone information clerk, and thereby, so too could Plaintiff.

**C.  New Evidence**

Plaintiff also argues that Defendant committed legal error because the Appeals Council failed to consider new evidence.  The Appeals Council received Dr. Bogaev's RFC questionnaire, which had taken place after the ALJ issued his decision, as part of the evidence presented for its consideration of whether Plaintiff's case should be reviewed. [213]  In denying Plaintiff's request for review, the Appeals Council noted that, among other reasons, it would review the ALJ's decision where the Appeals Council "receive[d] new and material evidence and the decision is contrary to the weight of all the evidence now in the record."[214]  The Appeals Council did not, however, provide a specific analysis of the relevance of Dr. Bogaev's RFC questionnaire.[215]

---

[213]    See Tr. 174-79.

[214]    Tr. 1.

[215]    See Tr. 1-5.

The Appeals Council is required to consider new and material evidence which relates to the period on or before the date of the ALJ's decision.  20 C.F.R. § 404.970(b).[216]  The requirement of a detailed discussion of additional evidence by the Appeals Council, however, was suspended by a memorandum from the Executive Director of Appellate Operations on July 20, 1995.  See Higginbotham v. Barnhart, 405 F.3d 332, 335 n.1 (5th Cir. 2005); Hearings, Appeals, & Litigation Law Manual, § I-3-5-90, 2001 WL 34096367.  [217] Accordingly, the Appeals Council did not err as a matter of law by failing to provide a detailed analysis of its consideration of Dr. Bogaev's questionnaire.

**D.  Summary**

Finding no legal error in the ALJ's decision and finding that substantial record evidence supports his conclusion that Plaintiff is not disabled, the court cannot overturn the decision.

**IV.  Conclusion**

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED** and that Defendant's cross

---

[216]    This section reads, in full:

If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the [ALJ's] hearing decision.  The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the [ALJ's] hearing decision.  It will then review the case if it finds that the [ALJ]'s action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R. § 404.970(b).

[217]    This manual contains program instructions for ALJs and the Appeals Council.

43

motion for summary judgment be **GRANTED.**

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 16th day of May, 2013.

Nancy K. Johnson
United States Magistrate Judge